### ADAMS (*First Election*).

The selectmen have no authority, at their discretion, to adjourn a town-meeting, without a vote of the meeting; and if such an adjournment takes place, while an election is in progress, and before it is completed, it cannot be legally completed at the adjourned meeting.

The election of Henry Wilmarth and Ebenezer Cole, returned as members from the town of Adams, was petitioned against by Jabez Hall and eighty others, and reported upon as follows by the committee on elections :—

"At the election of representatives, holden at said Adams, on the second Monday (the ninth day) of November, 1835, the whole number of votes returned on the ballot for first representative was 623; Stephen B. Brown had 311 votes; Henry Wilmarth had 312, and was declared to be elected by a majority of one vote.

On the ballot for second representative, the said Ebenezer Cole received, and was declared to be elected by, a majority of twelve votes.

From the evidence submitted to the committee, it appeared that the equality of the political parties in the town of Adams rendered the result of the election altogether doubtful, until it was closed, and that from this fact and other circumstances, great excitement prevailed during the whole election, which, commencing on said Monday, was closed on the Wednesday following.

That for causes invalidating the election of said Henry Wilmarth, the petitioners state :—

1. That one Ezekiel Bliss, a legal voter, presented his vote for the said Stephen D. Brown, which was by the selectmen refused.

Of this fact no evidence was offered to the committee.

2. That Jacob Thompson put in two votes.

3. That Lorenzo D. Bailey put in two votes.

At the hearing before the committee, after the case was opened, and the evidence submitted on the part of the petitioners, a motion was made by the respondents for a postpone-

ment of the hearing, to enable them to produce the testimony of said Thompson and Bailey and said selectmen of the town of Adams, in relation to the facts above stated. Thereupon, it was proposed by the petitioners, and agreed to by the respondents, that the testimony of Jenks Kimball, so far as it relates to said facts, should be waived, and the hearing proceed as if so much of said Kimball's testimony was not in the case. The hearing proceeded, and no comment was made on the part of Kimball's testimony referred to, by either party, but it was considered as withdrawn from the committee.

As the testimony referred to was waived by the counsel for the petitioners, on a motion to procure further testimony, and as what the result would have been, had such further testimony been introduced, cannot be known ; the committee are of opinion that the testimony waived should not be considered in determining the validity of said Wilmarth's election.

But, as the matter before the committee of elections is not the private interest of the petitioners and respondents, but a public interest exclusively within the control of the house of representatives, and not to be affected by the agreements or admissions of any persons ; the committee submit the testimony waived, as before stated, to the house.

Jenks Kimball testified, as follows: 'I think Jacob Thompson voted twice, and know Lorenzo D. Bailey voted twice, and informed the selectmen of the facts. Jacob Thompson was called twice on the same ballot, and the town clerk, Henry Wilmarth, observed that his name was on the list twice, through mistake; when it was objected he had voted before, Col. Wilmarth examined the list and found his name not checked, then he voted again; this was on Tuesday, in the forenoon; this was before the box was turned on the first ballot.'

(On being asked by the respondents,) 'Be you sure Jacob Thompson voted on the first day?'—the deponent replied, 'Yes, I am sure he voted.'

For causes invalidating the election of said Wilmarth and Cole, the petitioners allege, first, that on the eve of the

election, and after the assessors had made out their annual assessment, and committed the same to the collector of said town, the assessors entered on the list, then in the hands of the collector, the names of forty persons who had not been previously taxed for years on account of their age and poverty, and that the said persons were permitted to vote in said elections; and the names of the persons thus entered are annexed to said petition. This allegation is followed by another substantially the same, and referring to the same persons.

The committee are of opinion that these allegations are proved by the testimony, and as to the fact found, that the names of persons who voted were placed on the collector's list at an illegal and improper time, it is deemed immaterial, because it is not a pre-requisite to the right to vote, that the voter's name should be borne on the said collector's list at all; therefore, the fact that it is placed there, at an illegal time, cannot destroy the right to vote. The effect of the facts stated, on the qualification of the persons named, will be considered under a subsequent allegation referring expressly to 'illegal voters.'

Thirdly, the petitioners allege, that before the canvass was completed, to wit, on the first day of the election, the chairman of the selectmen proclaimed that the meeting was adjourned to the following day, without any vote of the town; and after the meeting was thus adjourned by the chairman, he, the said chairman, took the box containing the ballots up to that period, and carried the same away with him, said box not being tacked or sealed up.

This allegation is followed by two others, stating the same and additional facts, of which the committee find (from the testimony submitted to them,) the following to be material:—

That on the evening of the first day of the election, and after candle lighting, the votes for governor were counted, and there appeared to be a majority of votes for Edward Everett; that then motions were made to adjourn, and subsequently, to count the votes for representative; that confusion and noise occurred, accompanied with cries of 'adjourn,' 'no adjournment, count the votes,' &c., from the different parties who occu-

pied the different sides of the house, in which the election was held; that the noise and cries lasted from ten to fifteen minutes, then ceased, and were again at intervals renewed; that the chairman said a motion to adjourn was made, and remarked, as he frequently had, in the course of the election, 'that order must be preserved, or that he could not do business,' or words to that effect; that the chairman did not put or attempt to put the motions to the meeting, but on his own authority, or that of the selectmen, declared the meeting to be adjourned to 9 o'clock the next day, and then taking with him the ballot box, in the manner stated, he, with the selectmen, left the house, and the people dispersed.

The material fact set forth in these allegations, and proved by the testimony relating to them, is, that the chairman of the selectmen adjourned the meeting on his own authority, or that of the selectmen, without taking a vote of the meeting, and against the declared will of a large portion of the voters assembled.

The committee are of opinion, that neither the chairman of the selectmen, nor the selectmen, have the power of adjourning a meeting, at his or their discretion, or without a vote of the meeting.

The constitution, in the tenth article of amendments, declares that 'meetings may be adjourned, if necessary, for the choice of representatives,' without specifying whether they shall 'be adjourned' by the vote of the meeting, or by the officers presiding, or who shall determine the necessity of an adjournment.

The act 1795, c. 55, § 1, for regulating elections, provides, that 'the selectmen present shall preside in such meeting, and shall regulate the same,' and section 3d, 'shall have all the powers which are legally vested in the moderator of town-meetings, for the regulation thereof.'

The act of 1785, c. 75, § 6, provides, that the moderator 'shall be empowered to manage and regulate the business of the meeting,' and then minutely details the powers of the moderator, all of which contemplate the maintenance of order only;

42

the power to adjourn town-meetings is not mentioned; such a power is nowhere expressly given to the moderator, or to selectmen; and if they possess it from the statutes cited, it can only be by inference from them.

But the committee do not consider that the power to 'preside over a meeting and regulate the same,' or 'to manage and regulate the business of a meeting,' involves a power which may determine its duration, silence its debates or prevent its purposes; and in their construction of the statutes referred to, they feel not only confirmed but directed by the revised statutes; these statutes, c. 15, prescribe the duties and powers of moderators, and adopt without any material change, the language of the act of 1785, c. 55; they also by a distinct new provision, § 25, place the power of adjourning the town-meeting in a vote of the meeting; this is deemed by the committee a legislative declaration, that the power to adjourn town-meetings is not given to moderators by the act of 1785, for the chapter quoted (from the revised statutes,) manifestly (by adopting the same words of grant) gives them all the powers they had before by the act, and yet expressly provides that this power of adjourning town-meetings shall be placed elsewhere.

The revised statutes, (in the chapter quoted) direct the committee in construing the constitution, as well as the acts referred to; for if the constitution were considered as placing the power in question in the moderator or selectmen, the revised statutes would contravene the constitution in placing that power in 'the vote of the meeting.'

If neither the constitution nor the statutes give this power to moderators or selectmen, it remains where, in the opinion of the committee, it is placed by the common law of the land, in 'the vote of the meeting;' and this opinion is confirmed to the committee by the usage of this honorable house, and the general practice of the deliberative assemblies known to the law of the commonwealth.

If it is contended that, by 'a *casus omissus*' the law has left this power afloat, not placed anywhere; then it of necessity

follows, that, if placed nowhere, it is not placed in moderators or selectmen; these officers are the creations of the law, and can possess no powers except those with which the law has invested them.

If the adjournment was illegal, it was altogether inoperative, and the case is to be considered as if it had not been; it was no legal continuance of 'the legally notified meeting,' that was of necessity determined by the separation of the voters assembled; the assembling on the following day was not a legally notified meeting, and the proceedings of it were therefore merely void.

The committee find, that, at said election, fifty-one of the votes cast on the balloting for said first representative, and all the votes cast on the balloting for said second representative, were cast after the adjournment aforesaid; and they are of opinion, that the illegality of said adjournment affects alike the election of both of said representatives.

Some of the testimony submitted to the committee went to show, that the noise and confusion of the meeting, at the time of the adjournment, were so great as to render it impossible to put the motions made, or to ascertain the vote of the meeting upon them; but the committee are of opinion, that the weight of the testimony is against this position, and that the noise and confusion of a meeting cannot, under any circumstances, confer upon the selectmen a power to adjourn a meeting, which has not been given to them by the law.

Evidence was also submitted to the committee, going to show, that in previous years, the town-meetings of Adams had been adjourned by the chairman, without complaint or dissent on the part of the voters, and that during the last election, adjournments for dinner were made by the authority of the selectmen alone; but the weight of evidence disproved altogether the usage claimed for past years, and adjournments without dissent, for a short interval of time, were not considered to authorize an adjournment against the declared dissent of a portion of the voters, equal to a half, probably, of the whole number assembled.

It also appears from the testimony in the case, that on the day following the adjournment, at the time and place appointed, voters assembled, and the balloting was renewed, and the business of the meeting proceeded, as if said adjournment had been legal and regularly made.

As the committee are of opinion, that the motion to 'turn the box' was subsequent to the motion to adjourn, they think it was at all events out of order, and the chairman was not bound to submit it to the meeting.

The fact stated in the allegations last above set forth, that the chairman of the selectmen carried the ballot box with him from the meeting on the evening of the first day, is considered by the committee wholly immaterial; if the adjournment was legal, and effected a legal continuance of the meeting, it was the duty of the selectmen to keep the box till the votes were received, and sorted, and counted; and the fact that it was so kept, that they might have abused their trust, is not deemed proof that they did so. If the adjournment was illegal, and all subsequent proceedings void, the state of the ballot box at the time, if known, or its subsequent treatment or custody, cannot affect the decision of the house.

Sixthly. The petitioners allege, that, during the canvass for said Wilmarth, the selectmen publicly proclaimed, that, if they received the vote of one Daniel P. Lapham, they should adjourn, and send for Richmond Brown, to balance the vote of said Daniel P. Lapham; that they did take the vote of said Daniel P. Lapham, and then stated publicly that they should receive no more votes, except the vote of said Richmond Brown, who was notoriously an illegal voter, and known by the selectmen to be such. Afterward the said Richmond Brown came, and the chairman said they would take his vote according to contract.

No evidence was submitted to the committee, in relation to the legal qualifications of either Lapham or Brown, and they are therefore both presumed to have been legal voters.

The other facts stated in the allegation are deemed fully proved; but as it appears that the list of voters had been re-

peatedly called before the declaration of the chairman was made,—that the balloting had continued two days,—and that on the first day over five hundred and seventy votes were received, and on the second day only fifty,—and as it does not appear that any legal voter was prevented by the conduct or declaration of the selectmen from giving his vote,—and as this fact is put in evidence by the petitioners, is, from its nature, particularly susceptible of proof, and as the testimony fails to establish it, the committee are of opinion, that the allegation and testimony relating to it are immaterial, except as exhibiting great impropriety in the proceedings and conduct of the selectmen.

Seventhly. The petitioners allege, that the selectmen permitted several persons, to wit, ten, to vote in said election of said Wilmarth and Cole, who were illegal voters.

And the names of said persons are annexed to said petition.

The petitioners objected to Alpheus Rowse and Lorenzo D. Bailey, that they had not the residence in the town of Adams, which was required by the law as a qualification of a legal voter.

In relation to Rowse, the evidence proved that in February last, he left the town of Adams, taking with him his wife and household goods, and said at the time of his departure that he expected to reside in Pittstown, N. Y., a year or longer. He however returned to Adams with his wife in the latter part of July last, and has resided there since. His object in going to Pittstown was to take charge of a factory, as its overseer.

The committee did not find in this testimony conclusive evidence of such an intent on the part of Rowse, at his departure from Adams, as would effect a change or loss of his legal residence.

His actual absence was less than six months, and his declaration 'that he should be gone a year or longer,' rather limits the term of his expected absence, than indicates an intention of residing permanently elsewhere.

He left Adams for a temporary purpose, and in the exercise of his vocation; if it was his intention when that purpose

failed or was completed, be it sooner or later, to return there; his residence would not be lost, and such an intention is consistent with his declaration and the testimony, and is indicated by his subsequent and speedy return.

Other testimony was submitted to the committee, which was deemed by them inadmissible, but which if admitted would not have altered the opinion expressed.

In relation to Lorenzo D. Bailey, the evidence showed, that he went away from Adams in the fall or early part of the winter of eighteen hundred and thirty-three, and returned in the fall of eighteen hundred and thirty-four; and the witness who deposed to these facts testified that 'when he went away the first time, *he run away*;' for what cause, with what intent, and for what time, does not appear. And the committee find nothing in this testimony proving said Bailey not to be a legal resident in the town of Adams.

To all the persons referred to in this allegation, and in the second and third allegations above set forth, as illegal voters, the petitioners objected that they had paid no legal 'state or county tax' within two years, next preceding said election.

In relation to which the evidence showed, that on or about the 20th of October last, the assessors of the town of Adams made the assessment of taxes on the valuation taken for the town, and made up the list for the collector from the assessors' books, in which each person was taxed his proportion of the whole sum the town of Adams was to raise for the town and county tax for the year; the list so made up, being completed, was signed by one of the assessors, and left with the other two, to be delivered to the collector; the collector received the list from the assessors, duly completed, in the early part of November, for collection of the taxes. Two of the assessors took the list from the collector again on the Saturday evening preceding the election, saying, that 'they had omitted some names which ought to have been assessed.' They, with the assent of the third assessor, on Saturday evening, and on Monday morning, (while the election was in progress,) entered the names of the persons referred to in the

several allegations mentioned above;—though the number of persons on the collector's list was thus increased, no alteration was made in the original valuation, or assessments, so that each person previously assessed paid the same sum, and the same proportional part of the whole sum voted by the town and required by the county, that he would have paid had the additional names not been entered on the list of the collector; so much money, therefore, as was received from the persons added to the collector's list, was over and above the sum voted by the town. Of all the persons added to the list, but one was taxed for anything besides his poll.

From the evidence of Daniel Smith, the collector of the town of Adams, it appeared, that the taxes of 1835 were not paid in Adams by Asahel Hurlbert, John Allen, Sidney Barker, Stephen Young, Sylvester Cheesboro', Wm. Dean, H. Pike, Jno. Metcalf, Perry Beers, and Asa Hurlbert; and also, that these individuals had not paid any taxes in Adams for the two years next preceding the election. But it further appears, from said Smith's testimony, that some of the persons added to the collector's list by the assessors, in the manner stated, produced receipts of taxes paid in other towns; who or how many produced such receipts does not appear; so, that, for all that appears, some or all of the persons enumerated above, may have produced such receipts, and proved themselves legal voters at said election.

It also appears from said Smith's deposition, that three only of the persons who were added to the collector's list had, for two years previous to said election, paid in Adams any other tax than the poll tax assessed upon them for the year 1835, under the circumstances above detailed, and it was strenuously contended by the petitioners, that the act of the assessors, in entering names on the collector's list at the time and in the manner they did, was altogether illegal; that it created no 'tax,' and that the payment of the money assessed was not a payment of any 'legal tax,' and gave no right to vote to the persons paying it. Admitting this to be true, it is deemed immaterial, because the testimony does not admit of the ap-

plication of the argument to the point under consideration. Although this assessment may have been illegal, and the payment of it inoperative, yet it may be, that some of these persons also were among those of the added list, who, as Smith testifies, produced 'receipts of taxes paid in other towns;' this fact appears from the witness adduced by the petitioner on his cross examination, and his testimony leaves it uncertain who they were; it is uncertain as to each on the list, and therefore uncertain as to all; for, on going through the list, the committee are unable to say of any one, that his legal qualification is disproved; it is only rendered uncertain, and in proving no more than this, the committee are of opinion, that the petitioners fail to sustain the burden of proof that is upon them, and to rebut the legal presumption, that all the votes received by the selectmen were from legally qualified voters.

Eighthly. The petitioners allege, that during the canvass aforesaid the selectmen took from the box in which they were deposited several ballots, to wit, to the number of ten, all of which rendered the said election of representatives uncertain, irregular and void.

The testimony relative to this allegation proves, that a vote was taken by the chairman of the selectmen from the box of votes given for governor on the first day of the election, and put into the box of votes for representatives; but it also appears, that this was done in the presence and with the assent of the voter, to correct the mistake which he had made in depositing his vote in the wrong box, and the objection was waived by the petitioners.

The testimony also proves, that on the second day of the election, a vote was taken out of the representatives' box by the chairman of the selectmen; but it is also in evidence, that the vote was put in illegally and by a man who had voted before, and was openly withdrawn by the chairman in the performance and not in violation of his duty. Some doubt was expressed by the petitioners as to the identity of the vote withdrawn; but as it appears that 'the end of the vote stuck up,' because 'the box was nearly full;' that it was withdrawn imme-

diately after it was put in, the chairman observing 'it is not so far in but it may come out;' the committee have no doubt of what the witness to the fact seems at the time to have believed—that the vote taken out was the illegal vote put in.

Testimony was also given by two witnesses, who deposed that on the second day they were in the gallery, and saw the chairman take a vote from the box, and draw it 'across the end of the box' and drop it on the floor.

It was contended by the petitioners, that the testimony showed that the vote testified to by the two last mentioned witnesses was not the same with the illegal vote before mentioned.

The two last witnesses testified that they were in the gallery twenty-five or thirty feet from the chairman, and that in withdrawing the vote his hand was drawn 'across the end of the box;' while the first witness says 'the vote was not drawn across the end of the box;' but the different location of the witnesses, the two being in the gallery, the one on the floor of the house, and in different positions in relation to the chairman and the box, might account for a discrepancy so slight as this.

It was also contended, that the acts were proved as done on different times, but not one of the witnesses fixed with precision the time of the day, whether forenoon or afternoon, though all agreed that the fact they testified to happened on the second day of the election.

As the chairman was at the time in open meeting, and surrounded by his political antagonists, and under their excited supervision; as the act of withdrawing a vote was one which could hardly have escaped their notice, and no evidence of such an act is given by those in the chairman's vicinity, (save the testimony referring to the vote illegally put in); the committee are of opinion, that there is no proof in the case that the chairman was guilty of the grave charge contained in the allegation.

Tenthly. The petitioners allege, 'that after the selectmen returned the box and votes into the meeting from whence they had been taken the day before, they kept a memorandum of

43

every person who voted thereafter, with a view to know, as your petitioners believe, when they could with safety close the poll.'

The committee are of opinion, that this allegation is immaterial.

The committee also find that previous to said election, an agreement in writing was subscribed, by some of the petitioners and others of their political party, to raise a fund to prosecute according to law any illegalities which might be practised at said election, affecting its result.

All the testimony submitted to the committee was in depositions adduced by the petitioners, but it appeared by the return of the magistrate taking the depositions, that the selectmen of Adams, and the sitting members of this house from said town, were duly notified of the examination of said witnesses; that they, by counsel, attended the examination, and subjected the witnesses to such cross examination as they thought proper; and the fact, that the chairman of the selectmen, on the eve of the first day of the said election, adjourned the town-meeting without taking or attempting to take a vote of the meeting, appeared from the deposition of one of the said sitting members, and was distinctly admitted by both of them, before the committee, where the parties were heard by counsel.

On the facts, and for the reasons above set forth, the committee are of opinion, that at the town-meeting holden in Adams, as aforesaid, on the second Monday of November last past, for the election of representatives for said town, at this general court, now in session, the chairman of the selectmen of said town illegally adjourned said meeting, while said election was in progress, and before it was completed; and they therefore report that the supposed election of said Henry Wilmarth and Ebenezer Cole is void, and that their seats in this house be declared vacated."

The report was agreed to (283 to 103), and the seats of the members returned from Adams declared to be vacated.[1]   The members were allowed their pay to the day of the acceptance of the report, and a precept for a new election in Adams was immediately issued.

A new election took place accordingly, and one of the members elected came in, and was qualified and took his seat. This second election was also controverted, for the reasons and with the result stated in the next report.